# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

HENRY HEGEL and BRAD WEBER,
for themselves and others similarly situated,

        Plaintiffs,

    v.                                   Case No. 09-C-882

BRUNSWICK CORPORATION,

        Defendant.

---

## ORDER DENYING MOTION FOR CLASS CERTIFICATION

---

      This putative class action was removed from state court under the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. §§ 1332(d), 1453. Plaintiffs Henry Hegel and Brad Weber allege that their former employer, Defendant Brunswick Corporation ("Brunswick"), failed to pay them according to the terms of an incentive plan. Plaintiffs advance claims for breach of contract, quantum meruit, unjust enrichment and breach of the duty of good faith and fair dealing. Plaintiffs further allege that because Brunswick offered the same Cost Reduction Incentive Plan ("CRIP") plan to over a hundred similarly situated employees, this matter is best resolved as a class action under Rule 23 of the Federal Rules of Civil Procedure. The case is presently before me on Plaintiffs' motion to certify the class. Having considered the briefs and argument of the parties, I conclude that the motion should be denied.

## BACKGROUND

      Brunswick is the parent corporation of Mercury Marine, an operating division that provides engines, boats, services and parts for recreational, commercial and government marine applications.

Plaintiffs and those they allege are similarly situated were all managerial employees of Brunswick and involved in Mercury Marine's operation. Early in 2008, Mercury Marine's corporate leadership saw the troubled financial waters ahead and conceived a plan to reduce costs and retain its best and brightest among its managerial class, those thought of as the "100 influencers/difference makers." The form this plan took was the CRIP, which was announced in April 2008 at a two-day meeting of some of Brunswick's managerial employees in Fond du Lac, Wisconsin.

Mercury Marine's senior management informed the audience that eligible participants in the CRIP could receive payments from Brunswick based on a portion of the reduction in costs Mercury Marine was able to achieve by the year end. To be eligible, the participants needed to save more than $22 million and remained employed by the company through the end of 2008. As announced, the CRIP would pay an equal amount to each participant without regard to whether or not each individual took any specific action to contribute to the reduction in costs. More details about the CRIP emerged on May 6, 2008, in a meeting attended by 40-50 management employees. Shortly after this meeting, a copy of the CRIP plan summary was distributed by e-mail. As outlined in the e-mail, the CRIP would award management employees for cost reductions over the $22 million threshold amount and anticipated making payments in February 2009 but no later than March 15, 2009. The e-mail contained a "Management Rights" clause, which stated "The company reserves the right to revise, discontinue or cancel this plan or any awards associated with the plan at any time."

The CRIP initially included a BVA component, which measured the value added by the Mercury Marine division to Brunswick's bottom line. By the middle of 2008 it became apparent that given Mercury Marine's poor performance, the BVA component of the CRIP would not be met,

2

which would have had the effect of denying any payments under the CRIP. As a result, Mercury Marine's leadership decided to "eliminate the BVA funding requirement from the CRIP program," and this was communicated to CRIP participants in September 2008. This communication was silent on the Management Rights Clause that was included in the plan summary.

After the close of 2008, cost reduction measures employed by Mercury Marine resulted in savings to Brunswick in excess of those required to trigger payments under the CRIP. But because of the poor performance of Mercury Marine, no money was paid to any of the plan's participants under the CRIP. Plaintiffs allege that each CRIP participant is owed approximately $70,000 under the plan. Plaintiff Henry Hegel filed a putative class action against Mercury Marine in Fond du Lac County Circuit Court, and Brunswick removed the matter to this Court under the Class Action Fairness Act of 2005.

## ANALYSIS

Rule 23 of the Rules of Civil Procedure provides that one or more members of a class may sue as representative parties under certain conditions.

> (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). If the four conditions of Rule 23(a) are satisfied, Rule 23(b) permits the matter to be maintained as class action of a specified type. Because the class action presents a number of "downsides," district courts entertaining motions for class certification under Rule 23

3

must exercise "caution." *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 744-46 (7th Cir. 2008).

Brunswick maintains that Plaintiffs have failed to meet the numerosity, commonality, typicality, and adequacy of representation prerequisites of Rule 23(a). But most of Brunswick's opposition to Plaintiffs' motion for class certification stems from its assertion that given the facts of this case, individual questions will predominate over common questions. Fed. R. Civ. P. 23(b)(3). Plaintiffs, who have the burden of proving that the class should be certified, *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006), disagree. They contend that common questions will predominate over individual questions because Brunswick always treated its employees eligible to participate in the CRIP as a class and there are no factual issues relating to performance.

I conclude that Brunswick has the better argument on the question of whether individual issues will predominate over common issues. Plaintiffs' core claim in this case sounds in contract. The parties agree that if there was a contract, it was a unilateral contract based on the offer made by Mercury Marine's leadership beginning in April of 2008. Under this unilateral theory of contract formation, those employees eligible to participate in the CRIP could have accepted Brunswick's offer by performance, which would have amounted to remaining employed by Brunswick through 2008 and (as a group) meeting the cost reduction goals set by the CRIP. Given the description of the CRIP in the plan summary, it appears that no other performance was necessary on the part of those employees to whom Brunswick made the offer. Thus, Brunswick's contention that it needs discovery on what exactly each putative class member may have done to achieve cost savings rings hollow, as their performance was only linked to remaining employed and the group achieving a threshold objective.

4

Although individual issues relating to performance may not predominate, the same cannot be said for issues surrounding the Management Rights Clause. By its plain terms, the Management Rights Clause gives Brunswick broad authority to "revise, discontinue or cancel this plan or any awards associated with the plan at any time." When a party to a contract promises to do a thing but in the same promise says it reserves an unrestricted right not to do the thing promised, what results is an illusory contract. An illusory contract is unenforceable and arises when a contract is "conditional on some fact or event that is wholly under the promisor's control and his bringing it about is left wholly to his own will and discretion . . . ." *Nodolf v. Nelson*, 103 Wis. 2d 656, 660, 309 N.W.2d 397 (Wis. Ct. App. 1981) (quoting 1 Corbin on Contracts § 149, at 656-59 (2d ed. 1963)). The Management Rights Clause provides Brunswick total discretion to cancel the plan, as well as any awards associated with the plan at any time, which means that if the clause is valid, all that resulted was an unenforceable illusory contract.

Plaintiffs contend that in light of *Schlosser v. Allis-Chalmers Corp.*, 86 Wis. 2d 226, 271 N.W.2d 879 (Wis. 1978), the Management Rights Clause is ineffective. They assert that after 2008 they had performed under the CRIP, and in their estimation *Schlosser* states that an employer may not exercise a contractual right of cancellation after the employee has performed under the contract. In *Schlosser*, the defendant employer provided free life insurance to its retirees over the age of 65. The documentation the employer provided to its retirees indicated that the company reserved the right to amend or terminate the plan. 86 Wis. 2d at 231. After having consistently provided this noncontributory life insurance to its retirees since 1956, the employer began in 1973 requiring retirees to pay a premium for the same coverage. The Wisconsin Supreme Court held the employer's reserved power of amendment to be ineffective, stating:

5

. . . retirement benefit plans must be considered in light of modern economic conditions in which such plans form a real inducement for services and become important economic considerations for persons on fixed incomes. Thus we agree with the trial court's conclusion that it is the better law, consistent with sound public policy, that under these facts the group life insurance plan may not be unilaterally modified by Allis-Chalmers to the detriment of its retired employees.

*Id*. at 248.

The facts here are readily distinguishable from those in *Schlosser*. First, the benefit at issue in *Schlosser* was life insurance, a common means of providing security for an employee's family in the event of his or her death. Here, the benefit at issue is a cash bonus, which by definition one receives unexpectedly as an extra. And unlike the retirees in *Schlosser* who worked for years in reliance on their employer's promise to provide and maintain their life insurance even after their retirement, Plaintiffs here continued their employment for at most eight months in the hope that sufficient cost reductions would be achieved to trigger the bonus payments. Given these differences, the public policy concerns relating to retirement plans that the *Schlosser* court relied upon are simply not present. 86 Wis. 2d at 248. Thus, *Schlosser* is not controlling here, and the alleged contract is likely illusory.

Plaintiffs also contend, however, that Brunswick orally interpreted or modified the terms of the agreement so as to remove the Management Rights Clause. For example, Plaintiff Weber claims that on several occasions in 2008 after the CRIP was announced he spoke with various officials at Mercury Marine and expressed his concerns regarding the effect of the clause. (Doc. # 37.) Weber avers that in each instance the executives with whom he spoke assured him that the CRIP would not be cancelled as it was "self funded" based on the cost savings achieved by the entire group. But while management's statements to Weber may have some bearing on his own claim, they cannot

6

form any part of the claim of other members of the purported class who had no knowledge of them. To the extent Plaintiffs' contract claim is based on oral interpretations or modifications made to individual members of the proposed class, it seems clear that class questions do not predominate over individual questions, at least as to the contract claim.

Plaintiffs have asserted alternative claims of unjust enrichment and quantum meruit. Given the equitable nature of these claims, however, the need for individual inquiry is even more apparent. The questions of whether Brunswick has been unjustly enriched by any member of the proposed class, or whether any member should in equity be compensated for his or her extra contribution to the company's efforts to cut costs necessitates individual consideration of the particular facts and circumstances of what each putative class member did and how they enriched Brunswick. In short, these two equitable claims are patently individual in nature and individual issues would predominate over those common to the class.

In order to recover under a quantum meruit theory, a plaintiff must prove that the defendant requested plaintiff's services and that the plaintiff reasonably expected compensation for those services. *Ramsey v. Ellis*, 168 Wis. 2d 779, 784, 484 N.W.2d 331 (Wis. 1992) ("Recovery in quantum meruit is allowed for services performed for another on the basis of a contract implied by law to pay the performer the reasonable value of the services. To establish an implied contract, the plaintiff must show that the defendant requested the services and that the plaintiff expected reasonable compensation.") (citations omitted). The declarations Brunswick has gathered from putative class members demonstrate that employees eligible to participate in the CRIP had divergent expectations about being paid under the plan, with many stating they thought the program was purely discretionary. Not only would individualized questions arise as to liability on the issue of what each putative class member expected, any damages awarded under a quantum meruit theory

7

would have to be individualized, as the proper measure for such damage is the "reasonable value of the plaintiff's services." *Id*. at 785. Individual questioning would be an inescapable aspect of both the liability and damages portions of adjudicating a quantum meruit claim.

Similar individual inquiries would make impracticable any attempt to adjudicate the unjust enrichment claim through a class action. "To establish a claim for unjust enrichment, the plaintiff must prove three elements: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant had an appreciation or knowledge of the benefit; and (3) the defendant accepted or retained the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value." *Buckett v. Jante*, 2009 WI App 55, ¶ 10, 316 Wis. 2d 804, 767 N.W.2d 376 (citation omitted). As Brunswick observes, to the extent it benefitted from the collective efforts of the putative class in reducing costs, under an unjust enrichment theory each Plaintiff would have to demonstrate how Brunswick benefitted from his or her own actions. But most problematic for Plaintiffs is the third element of a claim for unjust enrichment, which requires an inquiry into the equities involved with each class member. As the Eleventh Circuit has observed, demonstrating that individual questions will not predominate common questions is particularly problematic where a claim of unjust enrichment is asserted.

> Critical for present purposes, before it can grant relief on this equitable claim, a court must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist. Due to the necessity of this inquiry into the individualized equities attendant to each class member, courts, including ours, have found unjust enrichment claims inappropriate for class action treatment. In short, common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts.

*Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) (citations omitted). Given the individual inquiries required in the equitable claims, I conclude that common questions are unlikely to predominate over individual ones, making class certification under Rule 23(b)(3) inappropriate.

8

## CONCLUSION

For all of the above reasons, I conclude that Plaintiffs' claims should not be adjudicated on a class basis, as individual issues of law and fact would likely predominate issues of law and fact common to the class. Because Plaintiffs have failed to satisfy the predominance requirement of Rule 23(b)(3), and they do not contend that any other type of class action would be appropriate, the motion for class certification is **DENIED**.

**SO ORDERED** this __19th__ day of July, 2010.

                                       s/ William C. Griesbach
                                       William C. Griesbach
                                       United States District Judge