# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

HENRY HEGEL and BRAD WEBER,
for themselves and others similarly situated,

            Plaintiffs,

    v.                                                            Case No. 09-C-882

BRUNSWICK CORPORATION,

            Defendant.

## MEMORANDUM AND ORDER

      Six former middle management-level employees of Mercury Marine, a division of Defendant Brunswick Corporation, brought this action against their former employer after they were denied payments to which they claim they are entitled under an incentive bonus plan. Plaintiffs advance claims for breach of contract, quantum meruit, unjust enrichment, and breach of the duty of good faith and fair dealing. The action was commenced in the Circuit Court for Fond du Lac County as a putative class action. Brunswick removed the matter to this Court under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), which gives this court original jurisdiction, notwithstanding that fact that Plaintiffs' motion for class certification has since been denied. *See Cunningham Charter Corp. v. Learjet, Inc.* 592 F.3d 805, 806 (7th Cir. 2010). The case is now before the Court on Brunswick's motion for summary judgment. For the reasons that follow, Brunswick's motion will be granted.

**I. Background**

Brunswick, a Delaware Corporation with its principle place of business located in Illinois, is a manufacturer of recreational sporting goods and equipment. Mercury Marine is a division of Brunswick with operations in Fond du Lac, Wisconsin and Stillwater, Oklahoma. Mercury Marine manufactures marine equipment, including watercraft, watercraft engines, and watercraft accessories. Plaintiffs were managerial employees of Brunswick and worked in the Mercury Marine division.

Early in 2008, it was apparent to Brunswick and Mercury Marine management that a worsening economic environment was about to place great challenges on consumer discretionary spending, including spending on the kind of recreational equipment and products that Mercury Marine manufactured and sold. In the first quarter of 2008, Brunswick internally announced a goal for cost-cutting in order to better prepare the company for anticipated difficult times. Recognizing that in the current economic environment the only way to increase revenue was to cut costs, Mercury Marine management set out to cut its costs by at least $30 million.

In April 2008, senior management of the Mercury Marine division gathered approximately 100 Mercury Marine division management-level employees for a two-day Leadership Forum at a conference center in Fond du Lac, Wisconsin. The purpose of the Leadership Forum was to provide these management employees with an understanding of the state of Brunswick, the Mercury Marine division, and their operations; and to outline the anticipated challenges to Mercury Marine's continuing operations and those that were facing Brunswick as a whole. During the first day-and-a-half of the Forum, Mercury Marine senior management outlined a series of business plans and targets for meeting the tough economic environment and weathering the anticipated storm. Chief

2

among the business plans and objectives identified were significant cuts in costs, which management believed would allow Mercury Marine and Brunswick to become a more efficient and leaner business operation. The central message of the Forum was that all employees needed to participate in taking extraordinary measures to reduce costs and to maintain cash flow in order for the company to remain viable.

On the afternoon of the second day of the Forum, Steve Cramer, Mercury Marine's Chief Financial Officer, provided a review of the Mercury Marine division's variable compensation program. As part of his presentation, Cramer introduced a new "pilot program" that was designed to more sharply focus management's attention on cost reduction efforts. The program was called the Cost Reduction Incentive Program, or CRIP. CRIP was designed for the approximately 100 management-level employees who senior management believed were in the best position to help determine and execute necessary changes in the cost profile of the company. Cramer explained that eligible CRIP participants would receive payments from Brunswick based on a portion of the reduction in costs Mercury Marine was able to achieve by the year end. To be eligible, the participants needed to cut costs by at least $22 million and remain employed by the company through the end of 2008. As announced, CRIP would pay an equal amount to each participant without regard to whether or not each individual took any specific action to contribute to the reduction in costs.

Concerned that, given the poor economic forecast that had been delivered earlier, the new plan would never pay out, Cramer was asked how the company planned on paying such compensation when it was doing so poorly. Cramer responded that CRIP would pay out because

3

it was self-funded from cost-savings. Plaintiffs claim that not only Cramer, but also Mercury's President, Mark Schwabeno, made similar statements to the effect that CRIP was self-funded.

More details about CRIP emerged on May 6, 2008, in a meeting attended by 40-50 management employees. Shortly after this meeting, Chuck Basten, Mercury Marine's Director of Compensation, distributed a copy of the CRIP plan summary by e-mail. According to the summary, CRIP would award management employees for cost reductions over the $22 million threshold amount and anticipated making payments in February 2009 but no later than March 15, 2009. The plan summary set out a payout structure which listed, for illustrative purposes, the participant pay-outs at various saving levels between $22 million and $40 million. Participant pay-outs shown at the various levels ranged from $2,500 to $40,000. Pay-outs above $40,000 were to be "reviewed and are solely at the discretion of the Mercury Marine Compensation Committee." (Second Kaplan Decl., Ex. L.) The summary repeated senior management's claim that CRIP was "self funded based on cost savings achievements." (*Id.*) Finally, the CRIP plan summary contained a "Management Rights" clause which stated "The company reserves the right to revise, discontinue or cancel this plan or any awards associated with the plan at any time." (*Id.*)

The CRIP plan summary initially included a Brunswick Value Added ("BVA") component, which measured the value added by the Mercury Marine division to Brunswick's bottom line. The BVA component prevented CRIP pay-outs if certain financial goals were not met. By the middle of 2008, however, it became apparent that given the difficult economic conditions and Mercury Marine's poor performance, the BVA component of CRIP would not be met, which would have had the effect of denying any payments under CRIP. To keep open the possibility of CRIP payments, Mercury Marine's leadership decided to "eliminate the BVA funding requirement from the CRIP program." This decision was communicated to CRIP participants in September 2008. This

4

communication was silent on the Management Rights Clause that was included in the plan summary.

After the close of 2008, measures employed by Mercury Marine resulted in a reduction in costs to Brunswick in excess of those required to trigger payments under CRIP. At the same time, the fourth quarter of 2008 saw a nearly complete meltdown in the United States economy, its financial market, and a continued decline in consumer confidence and in the sales and profits of Brunswick. Toward the end of November or early December 2008, Brunswick's stock dropped to approximately $2.00 per share, the lowest Plaintiffs had ever seen. As a result of the decline, including the reduction in its share price, Brunswick's cash position was extremely eroded and there arose serious uncertainty over the economic condition the company would face in the future. Based on these concerns, Brunswick's CEO Dusty McCoy decided that no bonuses would be paid under any incentive plans for Brunswick or its divisions, including CRIP. In explaining his decision, McCoy acknowledged that as 2008 played out, at least until August, the company's expectation that the marine industry was in significant decline was confirmed. But then in September, October and November, "the economy and the marine industry turned dramatically worse." (DPFOF ¶ 101.) The massive bank failures, the bankruptcies of the automobile companies, and the "very, very, significant decline" in the worldwide marine industry led him to conclude that the only way for Brunswick to survive was "to build as strong a balance sheet as possible [by] accumulating and protecting as much cash as possible." (*Id.*)

As a result of Brunswick's decision, no money was paid to any of the participants eligible for pay-outs under CRIP. Plaintiffs thereafter commenced this action. They allege that they are each entitled to a CRIP pay-out of approximately $70,000.

**II. Summary Judgment Standard and Procedure**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *McNeal v. Macht,* 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson,* 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In addition to the federal rule governing summary judgment procedure, parties are expected to comply with the additional requirements set forth in this district's local rules. *See* Civil L.R. 56. The local rule requires the moving party to provide either a stipulation of facts or a set of proposed findings of undisputed facts on which the motion is based with appropriate citations to evidence in the record that supports the proposed finding. Civil L.R. 56(b)(1)(B), (C). If the opposing party

6

believes there is evidence which places any of the proposed findings of fact submitted by the moving party in dispute, the opposing party must file a response noting the dispute supported by a citation to the record evidence in support thereof. Civil L.R. 56(b)(2)((B)(i). The opposing party may also submit proposed findings of additional facts that warrant denial of the motion, again with appropriate citations to the record. It is the parties' proposed findings of fact, together with the responses thereto that are to form the basis of the ruling the court is then expected to make on the motion for summary judgment. Thus, "[a]ssertions of fact in the parties' supporting memorandum must refer to the corresponding numbered paragraph of the statement of facts, statement of additional facts, or statement of stipulated facts." Civil L.R. 56(b)(6).

## III. Analysis

As a preliminary matter, Brunswick first argues that Plaintiffs failed to comply with the local rule in several respects. (Brunswick Reply at 2, n.2) In their Brief in Opposition to Brunswick's motion, Plaintiffs cite to affidavits and depositions instead of the proposed findings, and often they cite to facts that are contained in neither party's proposed findings. Brunswick urges the Court to exercise its discretion to disregard facts that were not properly formatted. *See Viilo v. City of Milwaukee*, 552 F. Supp.2d 826, 829 (E.D. Wis. 2008) ("With due regard for the local rules and the aforementioned matters, the court will not consider Viilo's proposed findings of fact submitted after summary judgment briefing was complete. Nor will the court consider the proposed facts offered in Viilo's brief, as they are not in proper form under Civil L.R. 56.2. Thus, the court will look to Viilo's responses to defendants' proposed findings of fact in determining whether Viilo has established a genuine question of material fact which will preclude summary judgment.")

While Brunswick is correct that Plaintiffs' submission does not fully comply with the local rules, the Court declines to exercise its discretion by disregarding facts proposed by them that are not in proper format. This is not to say that the Court does not expect compliance with the local rules governing summary judgment. Civil L. R. 56 is intended to clarify the undisputed facts that the moving party contends entitle that party to judgment as a matter of law. Failing to comply with the rule can add to the burden or even frustrate the goal of clarifying the facts that are not in dispute so that the parties and the court can focus on the legal significance of those facts to the claim or defense on which summary judgment is sought. Parties risk having their submissions struck or disregarded when they fail to fully comply. *Id.* Here, however, the violation is not egregious, it appears there was a good faith effort to comply, and there is no history of noncompliance. Under these circumstances, the Court declines to impose the sanction Brunswick requests and will proceed to address the merits.

Plaintiffs have asserted four separate claims against Brunswick: breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, and quantum meruit. I will address each in turn.

**A. Breach of Contract Claim**

The viability of Plaintiffs' breach of contract claim turns on whether there was a valid contract in the first place. Brunswick argues that CRIP was an illusory promise by virtue of the Management Rights Clause and was therefore unenforceable as a contract. Plaintiffs, in contrast, argue that CRIP was a unilateral contract and that Plaintiffs' performance made the contract binding. Alternatively, Plaintiffs argue that Mercury Marine senior management modified the

8

written plan by telling plan participants that CRIP would pay out regardless of the performance of the company.

As Plaintiffs acknowledge, the Court previously addressed their argument that CRIP was a unilateral offer that became a binding contract after they completed their performance in the Court's decision denying their request for class certification and for reconsideration thereof. Though the analysis was not final in that context, the Court now adopts and reaffirms its analysis of the issue for purposes of deciding the instant motion for summary judgment. By its plain terms, the Management Rights Clause gave Brunswick broad authority to "revise, discontinue or cancel [CRIP] or any awards associated with the plan at any time." This language, in the Court's view, rendered the purported contract illusory.

The concept of an illusory promise was explained by the Wisconsin Court of Appeals in *Devine v. Notter*:

> An illusory promise is a promise in form only: one that its maker can keep without subjecting him- or herself to any detriment or restriction. An archetypal example of an illusory promise is the statement that "I promise to do as you ask if I please to do so when the time arrives." *See* 2 Corbin § 5.28, at 142. A promisor can keep that promise by either doing as the promisee asks or not, and so the promisor maintains total freedom to do as he or she wants. Since the maker of an illusory promise assumes no detriment or obligation, an illusory promise is not regarded as consideration. *Id.* at 142-43. If a party to a purported contract has, in fact, made only illusory promises and therefore not constrained him- or herself in any way, he or she has given no consideration and therefore no contract exists. *See id.* Because no contract exists, neither party has a cause of action for breach.

2008 WI App 87, ¶ 4, 312 Wis. 2d 521, 753 N.W.2d 557. This is precisely what Brunswick did by including the Management Rights Clause in CRIP. Brunswick set forth in clear and unequivocal language that it "reserves the right to revise, discontinue or cancel this plan or any awards associated

9

with the plan at any time." In other words, Brunswick promised to render future performance if it decided to do so. Such a promise cannot ripen into a valid contract.

Plaintiffs argue that CRIP was in essence a unilateral offer which became a binding contract once they rendered the requested performance. Under unilateral contract principles, they note, a promise offered in exchange for specified action "becomes binding and irrevocable as soon as part of the requested performance has been actually rendered or a proper tender of performance has been made." (Pl.'s Br. In Opp. to Mot. for S.J. at 17, quoting 1-3 Corbin on Contracts §3.9 (2010)). Thus, once the eligible employees had completed their performance and cut costs by the threshold amount required, Brunswick could not lawfully deny them payment.

As this Court noted in its decision denying Plaintiffs' Motion for Reconsideration of its decision denying their Motion for Class Certification, this "argument ignores the fundamental distinction between an illusory promise and a unilateral contract offer." (Decision Denying Reconsideration at 2.) Absent the Management Rights Clause, Plaintiffs' argument would be a winner. *See Compton v. Shopko Stores, Inc.*, 93 Wis. 2d 613, 625, 287 N.W.2d 720, 725 (1980) ("This court has characterized pension and profit sharing plans as constituting an offer of the stated benefits in exchange for the service of an employee, and upon the employee's completion of the required services, a binding contract is formed under which the employer is obligated to deliver the benefits under the terms of the plan."). Where, as here, however, the employer couples an incentive or bonus plan with a provision reserving a right on the part of the employer to cancel the plan, no contract is formed. As Williston explains,

> an ostensible or apparent promise which makes performance entirely optional with
> the promisor is not a promise within the meaning of that term as used here because
> it is neither a clear manifestation of intention to act or refrain from acting, nor does

it justify the putative promisee in understanding that the promisor has made a commitment. Such an apparent or ostensible promise is said to be "illusory."

RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:2 (4th ed.). Thus, to the extent the Management Rights Clause remained a part of the arrangement, no enforceable contract existed.

Plaintiffs further argue, however, that oral representations concerning the terms and conditions of CRIP, made to them by Mercury Marine senior management with at least apparent authority to speak for Brunswick, "modified the written document by eliminating the Company's ability to cancel the program for any reason at any time." (Pl.s' Br. In Opp. at 1.) Plaintiffs contend that either the written plan, as modified by these oral statements, or the oral statements themselves, form a binding unilateral contract, which Brunswick breached by failing to pay them. (*Id.* at 1-2.) In support of this argument, Plaintiffs claim that Mercury Marine President Schwabero, Chief Financial Officer Cramer, and Director of Compensation Basting made statements to the effect that the CRIP was self-funded and that pay-outs under the CRIP would not be dependent on the financial condition of Brunswick. Relying primarily upon a declaration of Rick Estes, Mercury Marine's former Vice-President of Operations, Plaintiffs claim that Cramer and Schwabero "repeatedly told the participants [at the Leadership Forum] that this was a self-funded plan and not discretionary." (Decl. of Rick Estes ¶ 8.) Referring to Basting's email distributing the CRIP Summary, Estes' declaration continues:

> We were told by Schwabero and Cramer that the letter was in error and that the participants in fact were to be governed by the standards which were outlined in the initial meeting. Specifically, we were ordered to clearly and immediately tell our subordinates in the CRIP Plan that the plan was not discretionary and this it was going to be self-funded and not contingent in any manner upon BVA.

(Estes Decl. ¶ 10.) Based upon this evidence, Plaintiffs argue that a factual dispute exists over whether the Management Rights Clause remained operative and, thus, whether Brunswick breached a contract with them by failing to make pay-outs under CRIP.

There are several problems with Plaintiffs' argument. The first is that, as is clear from the deposition Estes gave after he signed the declaration, several of his statements upon which Plaintiffs rely are simply false. No one in Mercury Marine's senior management ever told Estes, as far as he can recall, that pay-outs under CRIP were "non-discretionary", nor did anyone ever tell him that the written CRIP summary containing the Management Rights Clause was in error. (Estes Dep. at 106, 128.) Estes assumed the pay-outs were "non-discretionary", in other words, that Brunswick had no right to deny payments if the threshold cost reduction was achieved, because senior management had repeatedly emphasized the plan was self-funded. Estes likewise assumed the plan summary was in error because the BVA requirement was later eliminated. No one in senior management ever told him the written plan summary was in error. (*Id.*)

More importantly, wholly aside from what Estes may have been told, Plaintiffs offer no evidence that either Estes or anyone else in senior management ever told them that the Management Rights Clause in the CRIP was removed or no longer in effect. In response to Brunswick's assertion that each of the Plaintiffs was aware of the existence of the Management Rights Clause in the plan summary, each of the Plaintiffs responded that while he or she was aware of the Clause, he or she "felt" or "believed" that the payout was guaranteed because the discretion afforded under the Clause could not be exercised after calendar year 2008 had ended. (Pl.s' Resp. to PPFOF ¶¶ 15, 16, 18, 20, 26, 28, 32, 33, 38, 43.) Of course, Plaintiffs' beliefs or feelings cannot change the meaning of a contract or create one where it does not already exist. *See Kernz v. J.L. French Corp.*, 2003 WI App

12

140, ¶ 20, 266 Wis.2d 124, 667 N.W.2d 751 ("Probably no rule is better understood than that the opinions of the parties to the contract as to what they took it to mean cannot be resorted to, either to explain or change [the terms of the contract].") (quoting *Hart v. Hart*, 117 Wis. 639, 654, 94 N.W. 890 (1903)). Thus, Plaintiffs' beliefs and feelings are irrelevant, and one wonders why Plaintiffs even offered them in response to Brunswick's proposed findings of fact.

It is true that Estes was told even as late as just before Christmas 2008, when the plants were going into their annual two-week year end shut-down, that Mercury senior management thought that CRIP pay-outs should be made and anticipated that they would be. Indeed, it appears clear that Mercury Marine Management, at least initially, may have tried to convince Brunswick that the CRIP pay-outs ought to be made. But the fact that Mercury Marine management expected or anticipated that the pay-outs would be made, and may even have felt a moral obligation to make them, does not create a legal or contractual obligation to do so. Having retained the discretion "to revise, discontinue or cancel [CRIP] or any awards associated with the plan at any time," the company was entitled to exercise that discretion, especially given the dire economic circumstances it was facing.

Plaintiffs' argument that Brunswick could only have exercised the discretion reserved under the Management Rights Clause prior to the end of the year is not only unsupported by the plain language of the clause, but is logically inconsistent with their claim that Mercury Marine senior management had eliminated the Clause in a subsequent amendment of CRIP or somehow waived it. It finds no support in the language of the Clause which expressly allows discontinuance or cancellation "at any time." And if, as Plaintiffs argue, Mercury Marine senior management had already waived, or orally agreed to eliminate, the Clause, then what authority would they have had to cancel the plan at all? By conceding that the CRIP plan could have been cancelled prior to the

13

end of 2008, Plaintiffs are implicitly acknowledging that the Management Rights Clause remained a part of CRIP. For this reason, the offer of a pay-out based on cost reduction efforts of the Plaintiffs could not ripen into an enforceable contract.

This does not make the plan a "lie" as Plaintiffs argue in opposing Brunswick's motion. (Pl.s' Br. In Opp. at 1.) A lie is a statement one knows to be false at the time it is made. Here, there is no evidence that Brunswick or Mercury Marine senior management intended not to make the payments to which Plaintiffs claim CRIP entitles them. In fact, as already noted, it appears that Mercury Marine senior management anticipated that the pay-outs would be made until the very end. But Brunswick was not contractually obligated to make the pay-outs, and given the dire economic circumstances it faced, it elected not to make them. In doing so, Brunswick breached no contract with the Plaintiffs.

In sum, summary judgment is proper on Plaintiffs' breach of contract claim because there was no contract. The Management Rights Clause rendered CRIP at most an illusory promise.

### B. Claimed Breach of the Duty of Good Faith and Fair Dealing

Under Wisconsin law, "[e]very contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties." *Estate of Chayka v. Santini,* 47 Wis.2d 102, 107 n. 7, 176 N.W.2d 561 (1970) (quoting 17 AM. JUR. 2d CONTRACTS § 256 (2006)). The duty of good faith and fair dealing arises in contract cases. *Metropolitan Ventures, LLC v. GEA Associates,* 2006 WI 71, ¶ 35 291 Wis. 2d 393, 717 N.W.2d 58, 2006 WI 71 (collecting cases). Here, as detailed above, there was merely an illusory promise, not a valid contract. As such Brunswick owed no contractual duty of good faith and fair dealing. *See id.* ¶¶ 33-35.

Alternatively, even if there was a valid contract, the "duty of good faith and fair dealing" cannot be applied to effectively write a contract clause out of existence. *See Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.,* 146 Wis.2d 568, 577, 431 N.W.2d 721 (Ct. App. 1988). Even assuming CRIP was a valid contract, the Management Rights Clause would be a key part of such contract. By hoisting the "duty of good faith and fair dealing" flag, Plaintiffs attempt to re-write CRIP to exclude the Management Rights Clause. But the duty of good faith cannot be used to re-write contract terms that are unambiguous. *See Tele-Port, Inc. v. Ameritech Mobile Comm.,* 2001 WI App 261 ¶ 12, 248 Wis.2d 846, 637 N.W.2d 782 (2001) (citing *Baxter Healthcare Corp. v. O.R. Concepts, Inc.,* 69 F.3d 785, 792 (7th Cir. 1995)) (applying Illinois law). Where, as here, a contracting party complains of acts of the other party which are specifically authorized by their agreement, a breach of the duty of good faith is not established. *See Super Valu Stores,* 146 Wis.2d 568, 577. Thus, even if there was a valid contract, Plaintiffs cannot rely on the "duty of good faith and fair dealing" to complain that Brunswick exercised the Management Rights Clause – Brunswick's act was specifically authorized by the purported contract.

**C. Unjust Enrichment Claim**

"[U]njust enrichment . . . arises when one party receives a benefit, the retention of which is unjust to another." *Wilharms v. Wilharms,* 93 Wis.2d 671, 678, 287 N.W.2d 779 (1980). To succeed on their unjust enrichment claim Plaintiffs must prove: (1) a benefit conferred upon Brunswick by Plaintiffs; (2) Brunswick's knowledge or appreciation of such benefit; and (3) Brunswick's acceptance and retention of such benefit under circumstances that would make it inequitable for Brunswick to retain the benefit without paying the value thereof. *W.H. Fuller Co. v. Seater,* 226 Wis.2d 381, 385-386, 595 N.W.2d 96 (1999).

Here, while Plaintiffs can easily establish the first and second elements of an unjust enrichment claim, they cannot meet the third element – they cannot show that it would be inequitable for Brunswick to retain the benefit from Plaintiffs' cost-savings efforts. This is because Plaintiffs themselves admit that their normal job duties included attempting to reduce costs for their employer; and Plaintiffs were paid a regular salary for their normal job duties. (DPF 16, 21, 27, 34, 39, 44.) As such Brunswick was well within its rights to retain the benefit of employees' services for which the company paid a regular salary. *Beer Capitol Distrib. v. Guinness Bass Import,* 290 F.3d 877, 881 (7th Cir. 2002). Dire economic conditions of 2008 required employees to work extra hard to keep their employers afloat. In many cases employees were fortunate simply to retain their jobs during a very difficult year. The fact that Plaintiffs may have worked extra hard in 2008 does not support their argument that they are entitled to the discretionary incentive bonus CRIP payments. As cost-savings mounted, Plaintiffs may certainly have hoped for payment under the CRIP. But that does not mean Brunswick's conduct was inequitable. The company certainly benefitted from the Plaintiffs' cost-saving efforts, but it did not benefit unfairly. The Plaintiffs were paid for their work; they understood from the start that the Management Rights Clause – allowing Brunswick to cancel CRIP – was part of the plan.

### D. Quantum Meruit Claim

In order to recover under a quantum meruit theory, a plaintiff must prove that the defendant requested plaintiff's services and that the plaintiff reasonably expected compensation for those services. *Ramsey v. Ellis,* 168 Wis. 2d 779, 784, 484 N.W.2d 331 (Wis. 1992) ("Recovery in quantum meruit is allowed for services performed for another on the basis of a contract implied by law to pay the performer the reasonable value of the services. To establish an implied contract, the

16

plaintiff must show that the defendant requested the services and that the plaintiff expected reasonable compensation.") (citations omitted); *see also Lindquist Ford, Inc. v. Middleton Motors, Inc.* 557 F.3d 469, 480-81 (7th Cir. 2009) ("[W]hether any expectation of compensation was reasonable" is relevant quantum meruit claims.) Finally,"[t]here can be no recovery in *quantum meruit* when a claimant has in fact already been compensated." *Gename v. Benson,* 36 Wis.2d 370, 376, 153 N.W. 2d 571, 574 (1967).

Here, as discussed above, Brunswick paid Plaintiffs a salary for their work – and Plaintiffs' job responsibilities included cost-savings efforts. Plaintiffs have not overcome the presumption that their salaries "were in full for all services rendered" to Brunswick. *See Ramsey v. Ellis,* 168 Wis.2d 779, 787, 484 N.W. 2d 331, 334 (1992) (discussing the presumption under the "periodic payment rule" which depends on "the nature of the payments and their relationship to the services performed."). Because Plaintiffs were compensated for their work they cannot recover discretionary bonuses under a quantum meruit theory.

Plaintiffs argue that there is a genuine issue of material fact over whether they reasonably expected payment under the CRIP program. They maintain that Mercury Marine's representations regarding the "self-funding" nature of CRIP somehow removed Brunswick's discretion to cancel the plan. They argue that removal of the BVA component led plan participants to believe that CRIP would payout regardless of Brunswick's financial performance. But these arguments do not square with the undisputed fact that all the Plaintiffs "acknowledge that no one affirmatively communicated that the Management Rights Clause was deleted or eliminated from the CRIP." (Response to DPF 72.) Each Plaintiff specifically agreed, in their respective depositions, that the Management Rights Clause could have been exercised to cancel CRIP at any time until December 31, 2008. (DPF 74.)

While Plaintiffs may have hoped for CRIP payouts – and their hopes were seemingly encouraged by the elimination of the BVA component – Plaintiffs still could not *reasonably* expect CRIP payouts where they admit the Management Rights Clause remained in effect, giving the company the authority to cancel CRIP "at any time." In sum, because Plaintiffs were paid for their work and because they acknowledge that Management Rights Clause permitted cancellation of CRIP, there is no genuine issue of material fact regarding their quantum meruit claim.

**E. Sealed Documents**

One further issue should be addressed. Throughout the case the parties operated under a stipulated Protective Order which essentially allowed them to expedite discovery by exchanging sensitive information that was arguably beyond the scope of discovery or otherwise not discoverable by simply designating materials as "confidential" or "attorney's eyes only" during their discovery exchange. When briefs, affidavits or exhibits filed with the court contained such information, the filings were made under seal. As a result, much of the record in the case is sealed even though the court has not made individualized findings of good cause to support maintaining those materials under seal.

It is well established that a party's own designation of confidentiality, even if not contested by an opposing party, is not sufficient to warrant an order by the Court maintaining the sealed status of documents that had been filed with the Court under seal. *See Hicklin Engineering L.C. v. Bartell*, 439 F.3d 346 (7th Cir. 2002)("what happens in the federal courts is presumptively open to public scrutiny"); *see also Union Oil of California v. Leavell*, 220 F.3d 562, 567-568 (7th Cir. 2000) ("Calling a settlement confidential does not make it a trade secret, any more than calling an executive's salary confidential would require a judge to close proceedings if a dispute erupted about

payment (or termination)."). Instead, in order to maintain any of the documents previously filed with the court under seal, the court must make a finding of good cause under Fed. R. Civ. P. 26(c). Accordingly, if either party believes there is good cause to maintain the material, or portions thereof, under seal it must provide an explanation to the Court within 30 days. The Court will then make its own determination. Absent a finding of good cause by the Court, the Clerk shall unseal the entire file in 45 days.

## CONCLUSION

Accordingly and for the reasons set forth herein Brunswick's motion for summary judgment (Dkt. 77) is **GRANTED**. Based on the record before me I conclude as a matter of law that CRIP did not give rise to an enforceable contract between Brunswick and Plaintiffs. Even when viewing the facts in a light most favorable to the Plaintiffs there is no genuine issue of material fact regarding Plaintiffs' claims for breach of contract, unjust enrichment, quantum meruit, or the alleged breach of the duty of good faith and fair dealing. The Clerk is directed to enter judgment in favor of Brunswick and dismissing Plaintiffs' claims. In addition, absent further order of the Court within the next 45 days, the Clerk is directed to unseal the entire file**.**

**SO ORDERED** this ___22nd___ day of March, 2011.

                                                          s/ William C. Griesbach
                                                        William C. Griesbach
                                                        United States District Judge